IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| TODD KOLSTAD and KRISTA KOLSTAD,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>CITY OF GLASGOW; ROBERT WEBER; TYLER EDWARDS; JOSHUA NOLAN; DOES 1–10; and CORPORATIONS A–J,<br><br>　　　　　Defendants. | CV 23-147-BLG-TJC<br><br><br>**ORDER** |

Plaintiffs, Todd Kolstad ("Todd") and Krista Kolstad ("Krista") (collectively, "the Kolstads"), bring this action against Defendants the City of Glasgow ("Glasgow"), Robert Weber ("Weber"), Tyler Edwards ("Edwards"), and Joshua Nolan ("Nolan") (collectively, "Defendants"). The Kolstads assert Fourth and Fourteenth Amendment § 1983 claims, as well as various state law claims arising from Todd's arrest on December 4, 2021. (Doc. 31.)

Presently before the Court are Defendants Edwards and Nolan's Motion for Summary Judgment (Doc. 38), and Defendants Glasgow and Weber's Motions for Summary Judgment (Docs. 42, 71). The motions are fully briefed and ripe for the Court's review, and the Court held a hearing on the motions on January 14, 2026.

/ / /

1

Having considered the parties' submissions and oral arguments, the Court finds that Edwards and Nolan's motion should be **GRANTED in part** and **DENIED in part** and Glasgow and Weber's motions should be **GRANTED in part** and **DENIED in part**.

## I.    FACTUAL BACKGROUND[1]

On the evening of December 4, 2021, at approximately 10:25 p.m., dispatch for Valley County, Montana, received a 9-1-1 call regarding a domestic disturbance.  The caller, later identified as the Kolstads' minor daughter, reported that "my parents are fighting and I'm scared," and that they "have hit each other."  Glasgow Police Department Officers Edwards and Nolan arrived at the Kolstads' residence in separate patrol cars at approximately 10:28 p.m.  Both officers wore body cameras which recorded all activities of the night of December 4, 2021, and the videos were filed with the current motions.

/ / /

---

[1] The background facts set forth here are taken from the parties' submissions and are undisputed except where indicated.  The Court notes that many of Plaintiffs' Statements of Disputed Facts consist of disputes as to "implications" and "suggestions" that can be drawn from the stated fact in question, but do not actually dispute the factual nature of the statement.  (*See, e.g.,* Doc. 53 at 3, 5, 7, 11, 14; Doc. 58 at 5, 6; Doc. 78 at 5, 17, 18, 19.)  To the extent Plaintiffs do not dispute the facts set forth in Defendants' Statements of Undisputed Facts, they will be deemed admitted.  *Metcalf v. ONEOK, Inc.*, 2019 WL 2746037, at *3 (D. Mont. June 12, 2019), *report and recommendation adopted by* 2019 WL 2745740 (D. Mont. July 1, 2019) (explaining facts may be deemed admitted when not properly opposed); L.R. 56.1(b)(1)(B); Fed. R. Civ. P. 56(e)(2).

Upon arriving at the Kolstad residence, Edwards and Nolan observed various items strewn across the front steps and yard area.  The officers looked through the front windows of the residence and observed Todd pick up and toss an item inside the home.  Edwards then knocked on the door and Todd answered.  Edwards asked him, "what's going on today?"; to which Todd answered, "just having an argument."  Edwards asked if he could come inside and Todd agreed.  Both Todd and Krista were intoxicated at the time.

Once inside, the officers observed a Christmas tree on its side as well as various other items scattered about on the floor.  Edwards asked Todd where his wife was, and Todd began walking down a hallway ahead of Edwards, calling out to Krista.  Edwards then positioned himself between Todd and a closed bedroom door where Krista was located.  Edwards instructed Nolan that they needed to "separate them."  Edwards knocked on the bedroom door and Krista opened it.  Edwards asked Krista if she was okay, and she said that she was fine, but that Todd was being "a jerk."

Meanwhile, Nolan directed Todd back down the hall, away from the bedroom.  Nolan asked Todd if he had any weapons on him.  In response, Todd became agitated, stated he did not have any "goddamn weapons," and raised his hands over his head.  Nolan said, "okay I'm just going to pat you down."  Nolan then reached for Todd, and Todd began moving away from Nolan toward the

hallway.  Nolan grabbed Todd's left arm, pushed Todd against a wall, and pulled his left arm behind his back.

Edwards came over to assist Nolan.  With Edwards' assistance, Nolan was able to place handcuffs on Todd.  Nolan again told Todd that he needed to pat him down, and said "we have to pat everyone down."  Nolan told Todd to stop moving several times, but Todd did not do so and continued to curse at the officers.  Nolan then used a "leg-sweep" technique to bring Todd to the floor.  As Nolan was holding Todd by his left arm, Todd landed on his knees and then his face struck the floor.

While on the floor, the officers continued to attempt to complete a pat-down.  Throughout the encounter, Todd was told at least seven times that the officers needed to pat him down.  Edwards and Nolan contend that Todd attempted to kick Edwards while they were attempting to do so, but Todd maintains that he was only using "his leg to protect himself when the officers were groping his genitals."  (Doc. 53 at ¶ 28.)  While on the ground, Todd said, "You guys, I'm not going to hurt you.  I'm not a violent person."

As a result of his face hitting the floor, Todd began bleeding from the mouth, and he spat blood.  Todd also said the cuffs "are so tight my hands are hurting," and "I can't even feel my hands."

/ / /

One officer then asked the other "take him to the car?"  The officers then brought Todd to his feet and removed him from the house.  Edwards waited with Todd on the front steps of the residence, while Nolan went to bring his patrol car closer.  While waiting for Nolan, Edwards told Todd that he would check the handcuffs for tightness, and he inserted a finger between the handcuffs and Todd's wrists.  While retrieving his patrol car, Nolan requested emergency medical services.

Todd would not or could not walk down the front steps, so Edwards and Nolan carried him down the steps to the patrol car.  Upon arriving at the car, Todd told the officers that he could not feel his fingers.  The officers again examined the handcuffs and then placed Todd into the back of Nolan's patrol car.  Edwards stayed behind to interview Krista and the Kolstads' daughter, while Nolan drove Todd to the Valley County Detention Center.

On the way to the detention center, Nolan asked Todd if "anything hurt" and Todd said, "yes, my wrists."  Nolan told Todd he would take the handcuffs off when they arrived at the jail.

After arriving at the sally port of the detention center, Nolan repeatedly told Todd to get out of the patrol car, but Todd requested that Nolan "give [him] a second."  After a few minutes, Todd was helped out of the patrol car by Nolan and a Valley County Sheriff's Deputy.  Nolan removed the handcuffs, which had been

on Todd for approximately 26 minutes.

When the ambulance Nolan requested arrived at the sally port, Nolan told Todd that he needed the EMTs to look at him, but Todd said, "I don't want them to look at me, I don't need them," and "I'm good."  Nevertheless, the EMTs approached Todd who held up his wrists, twisted them, and said, "wrists are good." The EMTs left, and Todd was booked into the Valley County Detention Center on charges of Partner or Family Member Assault, Mont. Code Ann. § 45-5-206, and Resisting Arrest, Mont. Code Ann § 45-7-301.

Todd was released from the detention center around 12:30 p.m. on December 6, 2021.  All charges against Todd were ultimately dismissed.

Todd alleges that he sustained a traumatic brain injury, injuries to his neck and wrists, severe emotional distress, as well as other unspecified injuries.  Todd alleges that these injuries continue to affect his cognitive functioning, memory, and emotional well-being.

Krista alleges that she suffered injuries including severe emotional distress, loss of consortium, and other unspecified damages as a result of the events of the night of December 4, 2021.

Todd filed this action on December 4, 2023.  (Doc. 1.)  On September 27, 2024, an amended complaint was filed which added Krista as a plaintiff.  (Doc. 31.)  In the amended complaint, Todd and Krista allege civil rights claims under 42

U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments against all Defendants (Count I); *Monell*[2] claims against Glasgow and Weber (Count II); negligence against all Defendants (Count III); and state law claims against Edwards and Nolan for assault, battery (Count IV); and intentional infliction of emotional distress (Count V).

Edwards and Nolan now move for summary judgment as to all claims against them in Counts I, III, IV, and V.  (Doc. 38.)  Glasgow and Weber initially moved for summary judgment solely on Krista's claims in Counts I, II, and V, (Doc. 42), but subsequently also moved for summary judgment on all claims against them.  (Doc. 71.)

## II.   LEGAL STANDARDS

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or unnecessary facts will not

---

[2] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of a factual dispute, the opposing party must "go beyond the pleadings and by [their] own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

The Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587.

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"When video captures the events in question, no genuine dispute of fact exists for anything that is clearly discernable in a videotape of the events at issue." *Est. of Simpson v. Yellowstone County*, 229 F. Supp. 3d 1192, 1196 (D. Mont. 2017). If the video does not capture "everything," however, the court can consider other evidence, "so long as it is viewed in the light most favorable to the non-moving party." *Id.*

## III. DISCUSSION

### A. Claims Against Edwards and Nolan

#### 1. Count I – § 1983 Claims

The Kolstads bring 42 U.S.C. § 1983 claims in Count I of the Amended Complaint, alleging violations of their rights under the Fourth and Fourteenth Amendments. Edwards and Nolan argue they are entitled to qualified immunity as to Count I. (Doc. 39 at 16–20.)

##### a. Qualified Immunity

Qualified immunity shields state officials from civil liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982).

"To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016). The court has discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has cautioned that clearly established law should not be defined at a high level of generality. *Id.* at 12. Instead, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

/ / /

10

It is not necessary to find a case in which "the very action in question has previously been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[E]ven if another case articulates an applicable legal principle, qualified immunity shields the defendant from liability when the circumstances of that case are 'materially distinguishable' from the one before [the Court]." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 826 (9th Cir. 2023) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"[T]he 'clearly established' prong of the qualified immunity analysis is a matter of law to be decided by a judge." *Reese v. County of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018). To make this determination, the Court looks to binding precedent from the Supreme Court and the Ninth Circuit. *Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022). The plaintiff bears the burden of proving the existence of a clearly established right at the time of the alleged misconduct. *Maraziti v. First Interstate Bank of Cal.*, 953 F.2d 520, 523 (9th Cir. 1992); *see also Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("Except in the rare case of an 'obvious' instance of constitutional misconduct (which is not presented here), Plaintiffs must '*identify a case* where an officer acting under

11

similar circumstances as [defendants] was held to have violated the Fourth Amendment.'  In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful.") (emphasis in original) (internal citation omitted) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)).

As to Fourth Amendment excessive use of force claims, the Supreme Court has emphasized that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix*, 577 U.S. at 12).  The Supreme Court explained that "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* at 105 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).

Edwards and Nolan argue they are entitled to summary judgment under both prongs of the qualified immunity analysis because their conduct did not violate a constitutional right, and that, in any event, there is no caselaw that clearly establishes their actions would violate a constitutional right.[3]

---

[3]  Since neither Plaintiffs nor Defendants make a distinction regarding the

### b.    Todd Kolstad's Fourth Amendment Claims

The Amended Complaint asserts that Defendants "depriv[ed] Todd of . . . the right to be free from unreasonable seizure, excessive and unreasonable force, and unlawful deadly force, as secured by the Fourth and Fourteenth Amendments." (Doc. 31 at ¶ 45.)  Although Todd alludes to the Fourteenth Amendment, claims for unlawful seizure and excessive force are only cognizable under the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Moreover, Todd did not present arguments regarding a distinct Fourteenth Amendment violation in response to Edwards and Nolan's motion for summary judgment—which requests dismissal of all claims and specifically addresses Todd's § 1983 claims.  (*See* Doc. 52.)  Accordingly, to the extent Todd alleges Fourteenth Amendment § 1983 claims in Count I, summary judgment in favor of Defendants is appropriate.

As for Todd's Fourth Amendment claims, he argues that "without any provocation, and with no justification, Officer Nolan seized [him] and began to place him into handcuffs." (Doc. 52 at 3.)  Todd contends that his seizure was unreasonable because the alleged crime the officers were responding to was a misdemeanor offense, and at the time they entered the Kolstad residence no crime was taking place.  (*Id.* at 9–10.)  Todd also argues that his seizure was unjustified

---

culpability or liability of Edwards and Nolan based on their respective actions, the Court will not differentiate between them in analyzing the claims against them.

because his "minor attempts to avoid being searched against his will do not constitute actively resisting or attempting to flee." (*Id.* at 13–14.)

Edwards and Nolan counter that "particularized suspicion gave them the right . . . to frisk [Todd] to make sure he was not armed." (Doc. 56 at 6.) They further argue that it was lawful to seize Todd because, on arrival, they had "cause" to believe violations of Mont. Code Ann. § 45-5-206 (partner or family member assault) had occurred; they could "readily infer" that a violation of Mont. Code Ann. § 45-6-101 (criminal mischief) had been committed; and, moreover, they witnessed Todd commit the crimes of obstructing a peace officer and resisting arrest when he did not comply with their attempts to pat him down for weapons. (Doc. 56 at 6–7.)

Todd also alleges that Edwards and Nolan used excessive force both in bringing him to the ground and by placing his handcuffs overly tight. (Doc. 31 at ¶¶ 29–30.) For their part, Edwards and Nolan contend that the force used on Todd was the minimum amount necessary to gain compliance and control under the circumstances, and that the handcuffs were properly fitted.

In sum, Plaintiffs allege that both Todd's Fourth Amendment "right to be free from unreasonable seizure" and his right to be free from excessive and unreasonable force were violated. (*Id.* at 9.) Whether Todd was unlawfully seized and whether the officers used excessive force are separate and distinct inquiries.

*See Valazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015) ("establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice versa."). Each will be addressed in turn below.

**i.      Unreasonable Seizure**

While the attempt to pat Todd down for weapons led to his arrest on charges of resisting arrest and partner or family member assault, two distinct seizures occurred, and both must be analyzed to determine whether Todd's Fourth Amendment rights were violated. First, the Court must determine whether attempts to pat Todd down in his own home amounted to an unlawful seizure, and then whether his subsequent arrest was a lawful seizure.

Warrantless searches and seizures are per se unreasonable except under certain recognized exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). "To determine the constitutionality of a seizure '[courts] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The question the court must answer is "whether the totality of the circumstances justified a particular sort of search or seizure." *Id.* at 8–9.

/ / /

/ / /

15

### (1)    Pat-Down

Police officers that have lawfully entered a residence may pat down a suspect for weapons if there is a reasonable suspicion that the suspect is armed. *United States v. Flippin*, 924 F.2d 163, 165–66 (9th Cir. 1991).  The purpose of a limited pat-down search for weapons is to allow officers to conduct investigations without fear of violence.  *Adams v. Williams*, 407 U.S. 143, 146 (1972).  Nevertheless, "[a] frisk for weapons 'is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.'"  *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016) (quoting *Terry v. Ohio*, 392 U.S. 1, 17 (1968)).  Therefore, "[u]nless an officer can point to specific facts that demonstrate reasonable suspicion that the individual is armed and dangerous, the Fourth Amendment tolerates no frisk."  *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009).

"The reasonable suspicion standard 'is not a particularly high threshold to reach' and is less than probable cause or a preponderance of the evidence."  *United States v. Taylor*, 60 F.4th 1233, 1241 (9th Cir. 2023) (quoting *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc)).  The reasonable suspicion standard "allows officers to make commonsense judgments and inferences about human behavior . . . [and] draw on their own experience and specialized training to arrive at conclusions that might well elude an untrained

16

person." *Taylor*, 60 F.4th at 1241 (internal quotations, citations, and punctuation omitted).

Whether reasonable suspicion exists depends on the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Courts determine whether reasonable suspicion existed based on "'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Flippin*, 924 F.2d at 166 (quoting *Terry*, 392 U.S. at 27); *see also United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007) ("[W]hether the actions of the police are objectively reasonable is to be judged by the circumstances known to them.").

A suspect's movements and behavior are significant factors in determining whether there is reasonable suspicion that a suspect is armed. *See Flippin*, 924 F.2d at 166 (collecting cases); *see also United States v. Brown*, 996 F.3d 998, 1007–08 (9th Cir. 2021) ("We have recognized that abrupt movements or suspicious, furtive behavior may justifiably prompt an officer to fear for his or her safety.") (internal citations, quotations, and punctuation omitted); *Thomas*, 818 F.3d at 877 (collecting cases). But while "noncompliant behavior can contribute to reasonable suspicion a suspect is armed," *Thomas*, 818 F.3d at 890, "refusal to consent to a search cannot itself form the basis for reasonable suspicion." *United States v. Santos*, 403 F.3d 1120, 1125–26 (10th Cir. 2005).

Moreover, although "[t]he domestic violence nature of a call is certainly relevant to an officer's assessment of whether to conduct a search for weapons," the fact that police are responding to a domestic violence call "is not alone enough to establish reasonable suspicion a suspect is armed." *Thomas*, 818 F.3d at 886, 891. Further, "[a] mere inchoate and unparticularized suspicion or hunch that a person is armed and dangerous does not establish reasonable suspicion, and circumstances suggesting only that a suspect would be dangerous *if* armed are insufficient. There must be adequate reason to believe the suspect *is* armed." *Id.* at 876 (emphasis in original) (internal citations and punctuation omitted). "An officer is not free to ignore the actual circumstances he encounters in favor of a personal policy that he will execute a patdown frisk whenever he responds to a call concerning a perceived domestic dispute." *Id.* at 886.

Here, the officers were investigating a 9-1-1 call about a domestic disturbance that had been received by dispatch only a few minutes prior to their arrival. The caller alluded to the Kolstads "hitting each other," but said nothing about weapons. When the officers arrived, they observed objects strewn outside the home, a Christmas tree on its side, and other household items scattered about the floor of the household, indicating a possible altercation had occurred. Through the front windows they also saw Todd pick up and toss an object inside the house. After the officers entered the Kolstad residence through Todd's consent, Todd

18

admitted he had been drinking and the officers could see that Todd was intoxicated.

Before attempting to pat Todd down, Nolan asked Todd if he had any weapons, which caused a change in Todd's demeanor. Whereas Todd had been calm and cooperative up to that point, when Nolan asked about weapons, Todd threw up his hands and said he didn't "have any goddamn weapons." Although Todd became agitated, it was only after Nolan told Todd he needed to pat him down for weapons that Todd began to move away from Nolan toward the hallway.

The officers present arguments regarding the domestic violence nature of the call and the fact that the house and yard were in disarray, but no specific reasons for believing that Todd was armed. Indeed, Nolan's statement during the struggle that they have to pat everyone down, and his statement in a declaration that upon bringing Todd back down the hallway, he "intended to ask questions about the dispute and pat [Todd] down for weapons," (Doc. 40-2 at 3), indicate that the officers believed they were entitled to conduct a pat-down as a matter of course. But the officers did not automatically have authority to pat Todd down upon entering his residence, and they have failed to articulate that they had the necessary reasonable suspicion to believe Todd was armed and dangerous to perform a frisk. Accordingly, once they "initiated [Todd's] detention for the purpose of a weapons frisk, the constitutional violation was complete." *Thomas*, 818 F.3d at 888.

19

In addition, the violation was clearly established at the time of the incident. Decades ago, in *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court established that the Fourth Amendment requires reasonable suspicion that a suspected is armed and presently dangerous in order to perform a weapons frisk. Additionally, the Ninth Circuit made clear in its decision in *Thomas*, over five years before this event, that the domestic violence nature of a call does not establish the reasonable suspicion necessary to conduct a frisk.  Therefore, Defendants Edwards and Nolan are not entitled to qualified immunity on Todd's § 1983 claim based upon the seizure to conduct a pat-down search.

### (2)    Arrest

"An arrest is a wholly different kind of intrusion upon individual freedom from a limited search for weapons." *Terry*, 392 U.S. at 26.  "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City and County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

"If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the

Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). *See also Howell v. Earl*, 2014 WL 2594235, at *8 (D. Mont. May 30, 2014) ("The court need not find probable cause existed for the specific offense identified by the law enforcement officer on the scene. Rather, the court need only be satisfied that probable cause existed 'for *any* offense.'") (emphasis in original) (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1147 (9th Cir. 2012)). Moreover, "a person does not have the right to resist arrest even if the charges are false or the arrest unlawful." *United States v. Willfong*, 274 F.3d 1297, 1301 (9th Cir. 2001). "Subsequent dismissal of criminal charges also does not affect the determination of whether probable cause existed to support the arrest." *Huber v. Coulter*, 2015 WL 13173223, at *7 (C.D. Cal. Feb. 10, 2015).

Todd does not dispute that he resisted the officers' attempts to pat him down. Instead, he contends that any resistance he put up was minor and was in response to an illegal seizure. But "[t]he absence of probable cause does not grant an individual the right to offer resistance." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001). Even though the officers lacked reasonable suspicion that Todd was armed, the officers later acquired probable cause to arrest him for, at a minimum, Obstructing Peace Officer or Other Public Servant, Mont. Code Ann. § 45-7-302. The parties do not address when a full custodial arrest occurred, and "[t]here is no bright line rule for determining when

21

an investigatory stop crosses the line and becomes an arrest." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002) (internal quotations and citations omitted).  It is a fact-specific inquiry, which requires consideration of the totality of the circumstances.  *Id.*; *see also Jackson v. Johnson*, 797 F. Supp. 2d 1057, 1064–66 (D. Mont. 2011) (collecting and analyzing cases).  Nevertheless, an arrest occurred here at least when the officers removed Todd from the home and brought him to the patrol car.  At that time, because Edwards and Nolan had probable cause to arrest Todd for a crime committed in their presence, they did not violate his Fourth Amendment right to be free from unreasonable seizure when they did so.

In sum, while the pat-down was an unlawful seizure, the subsequent arrest was not.  Edwards and Nolan are, therefore, not entitled to qualified immunity as to the seizure that occurred to perform a pat-down search, but are entitled to qualified immunity as to the seizure that subsequently occurred in effecting Todd's arrest.

Whether the quantum of force the officers used in effecting the seizures was reasonable, or whether it violated Todd's Fourth Amendment right to be free from excessive force, is a separate question.

### ii.    Excessive Force

Excessive force claims are analyzed under an objective reasonableness standard.  *Graham*, 490 U.S. at 394–95.  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a

careful balancing of the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at

stake." *Id.* at 396 (internal quotations, citations, and punctuation omitted).

"Because the test of reasonableness under the Fourth Amendment is not capable of

precise definition or mechanical application, however, its proper application

requires careful attention to the facts and circumstances of each particular case."

*Id.* (internal quotations, citations, and punctuation omitted). "The 'reasonableness'

of a particular use of force must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "Not

every push or shove, even if it may later seem unnecessary in the peace of a

judge's chambers, violates the Fourth Amendment. The calculus of reasonableness

must embody allowance for the fact that police officers are often forced to make

split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Id.*

at 396–97 (internal quotations, citations, and punctuation omitted).

In evaluating excessive force claims, courts examine "the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight." *Id.* at 396. Courts also consider "under the totality of the

circumstances, the 'quantum of force' used to arrest the plaintiff, the availability of

alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal quotations, citations, and punctuation omitted). "Because it is the *need* for force which is at the heart of the *Graham* factors, the facts underlying the seizure are pertinent in judging the overall reasonableness of the seizure for Fourth Amendment purposes, including the reasonableness of the force used to effectuate the seizure." *Thomas*, 818 F.3d at 890 (emphasis in original) (cleaned up). While the fact that officers "had no reason to believe [a suspect] was armed and dangerous, and hence no need to conduct a frisk, is relevant—indeed, highly relevant—to the excessive force analysis," *id.*, establishing that a seizure is unlawful does not automatically make any force used in the seizure excessive. *See Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004).

Here, Todd alleges Edwards and Nolan used excessive force both in performing a leg-sweep maneuver to bring him to the ground and by placing his handcuffs overly tight. The Court will address these claims separately, as either could form the basis of a viable § 1983 claim. The claims will be considered under the second prong of the qualified immunity analysis; i.e., whether it was clearly established at the time of Todd's arrest that the force used was excessive.

/ / /

/ / /

24

### (1)   Leg-Sweep

Todd characterizes the alleged Fourth Amendment violation here as the "right to be free from excessive force during an initial investigation of a misdemeanor." (Doc. 52 at 14.)  In support, Todd cites several cases from the Ninth Circuit where excessive use of force was found.  But Todd defines his claim with an impermissibly high level of generality, and the factual scenarios in the cases cited by Todd are readily distinguishable from the facts at issue here.

Todd cites to *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007), a case in which a suspect had already been handcuffed and searched for weapons. The suspect was then slammed into a wall so forcefully that his head left a dent in the wall's sheet rock, thrown down so that his teeth struck the ground, and then turned over and punched in the face.  This factual scenario is dissimilar to the one at issue here.  Todd was neither fully handcuffed nor patted down for weapons when Edwards and Nolan took him to the ground, and the force used by Edwards and Nolan was much less severe than that used by the officer in *Davis*.

Todd's citation to *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), is similarly unavailing. The officer in that case fired a lead beanbag round into a suspect's eye without warning—a use of force not analogous to that employed by Edwards and Nolan, and performed under dissimilar circumstances.

/ / /

25

Todd also cites to *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005), a case in which officers responded to an emergency phone call that a man was hitting his wife and encountered an unarmed suspect when they arrived on the scene.  While the lead-up to the use of force is similar to the instant case, the amount and type of force used by the officers in *Smith* is not analogous; the officers in *Smith* repeatedly deployed pepper spray and ordered attacks by a police canine while the suspect was pinned down, then dragged him face-down off his porch.

Todd is also not helped by citations to *Hughes v. Kisela*, 841 F.3d 1081 (9th Cir. 2016), because, as Edwards and Nolan point out, the holding in that case was overturned by the Supreme Court in *Kisela v. Hughes*, 584 U.S. 100 (2018).

In sum, none of the cases cited by Todd would have put Edwards and Nolan on fair notice that performing a leg-sweep on a resisting suspect constituted excessive force and was unlawful.

The most analogous case to the facts and law at issue that the Court was able to find is *Shafer v. County of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017), a case in which the Ninth Circuit found a law enforcement officer's use of a leg-sweep maneuver did not violate clearly established law.  There, two sheriff's deputies observed a college student walking with water balloons in his hands a short time after a complaint was made about students being hit with water balloons.  *Id.* at

26

1113. The officers approached the student and ordered him to drop the balloons. *Id.* The student did not comply, despite being ordered multiple times to do so. *Id.* Instead, the student attempted to walk past the deputies. *Id.* at 1114. To stop the student from leaving, one of the deputies reached out and grabbed him by the arm, but the student resisted by pulling his arm away. *Id.* A deputy then used a leg-sweep maneuver, which caused the student to fall face-first onto the pavement. *Id.* The student was eventually arrested for misdemeanor resisting, obstructing, or delaying a peace officer. *Id.* at 1116.

The district court denied the deputy qualified immunity and a jury convicted him of violating the student's Fourth Amendment rights. The Ninth Circuit vacated the conviction, however, finding the deputy was entitled to qualified immunity under the clearly established prong. The Court explained:

> Defined at an appropriate level of specificity, the question at hand is whether an officer violates clearly established law when he progressively increases his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuses to comply with the officer's orders and resists, obstructs, or delays the officer in his lawful performance of duties such that the officer has probable cause to arrest him in a challenging environment. The answer is no.

*Id.* at 1118.

Other cases likewise demonstrate that, under similar circumstances to those here, the violation of a constitutional right is not clearly established. In *Garcia v. City of Santa Clara*, 772 F. App'x 470 (9th Cir. 2019), for example, the Ninth

27

Circuit upheld a finding of qualified immunity for officers who, while attempting to arrest the plaintiff for a misdemeanor, used control holds, punches, and a leg-sweep. *See also Bennett v. Gow*, 345 F. App'x 286, 287 (9th Cir. 2009) (finding the district court properly granted qualified immunity to an officer where the plaintiff had walked away despite the officer's instructions to stop, twisted away when the officer began to handcuff him, and the officer "then pushed [the plaintiff] to the ground using relatively minor force and finished handcuffing him. Although certainly uncomfortable and unpleasant, the take-down was not an objectively unreasonable use of force."); *accord Griggs v. Brewer*, 841 F.3d 308, 314 (5th Cir. 2016) ("precedent does not clearly establish that [a] 'takedown' maneuver— against a drunken, erratic suspect who is resisting arrest—is constitutionally unreasonable").

Here, like the deputy in *Shafer*, Edwards and Nolan were in a challenging environment. After informing Todd that they were going to perform a pat-down, he became agitated and resisted the officers' attempts to pat him down for weapons and refused to obey their commands that he stop moving and comply. Like the deputy in *Shafer*, Edwards and Nolan progressively increased their use of force from verbal commands, to an arm grab, and eventually to a take-down maneuver. If the deputy in *Shafer* was not on notice his actions would violate the Fourth Amendment, it is likewise not obvious that Edwards and Nolan would have been

28

on notice their use of force was unlawful.  Accordingly, Edwards and Nolan are entitled to qualified immunity as to Todd's claim that the leg-sweep maneuver violated his Fourth Amendment right to be free from excessive force.

### (2)    Handcuffing

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.  That said, "[t]he right to be free from excessive force in handcuffing is clearly established in [Ninth Circuit] precedent." *Luchtel*, 623 F.3d at 989 (Beezer, J., concurring).  "This is true even when the plaintiff actively resists handcuffing." *Id.*

Nevertheless, the legal contours of an excessive force claim based on overly tight handcuffing are "messy" because "the level at which tight handcuffing becomes unconstitutional is not well defined." *Ramorino v. County of Los Angeles*, 2024 WL 3468328, at *6 (C.D. Cal. May 31, 2024) (quoting *Brooks v. Ruiz*, 2024 WL 2702916, at *4 (C.D. Cal. Apr. 22, 2024), *report and recommendation adopted by* 2024 WL 2702650 (C.D. Cal. May 22, 2024)).  While Ninth Circuit precedent is clear that unreasonably injuring a person while handcuffing them constitutes excessive force, *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989), district courts have reached conflicting determinations on the question of whether demonstrable injury is a prerequisite to bringing an excessive

force handcuffing claim, or whether such a claim can be maintained on the basis that officers unreasonably inflicted pain through handcuffing. *Compare, e.g., Chambers v. Steiger*, 2015 WL 9872531, at *8 (W.D. Wash. Oct. 29, 2015) ("to establish a Fourth Amendment violation from tight handcuffing, there must be, at a minimum, medical or other evidence of injury") *with Arias v. Amador*, 61 F. Supp. 3d 960, 977 (E.D. Cal. 2014) (denying defendants summary judgment where plaintiff did not present evidence of an injury but alleged that handcuffs caused him unreasonable pain and officers ignored requests to loosen them); *see also Ramorino*, 2024 WL 3468328, at *6–8 (collecting cases). Courts that have not required evidence of injury at the summary judgment stage reason that "[t]he unjustified infliction of pain offends the Fourth Amendment, regardless of whether the person on whom that pain is inflicted suffers a resulting injury." *Ramorino*, 2024 WL 3468328, at *8.

Accordingly, whether handcuffing is so tight that it constitutes excessive force can turn on whether the handcuffs caused demonstrable injury and/or whether officers caused unnecessary pain by "ignor[ing] or refus[ing] requests to loosen the handcuffs." *Brooks*, 2024 WL 2702916, at *4 (collecting cases). Therefore, "[t]he issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses." *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000). *See, e.g., Thompson v. Lake*, 607 F. App'x 624, 625 (9th

Cir. 2015) ("Here, a jury could credit [plaintiff's] account that his handcuffs were excessively tight and that the police officers failed to loosen them. Whether the handcuffs were actually too tight, and whether the officers checked the handcuffs to ensure that they were not too tight, are disputed factual issues that preclude summary judgment.").

In this case, Todd alleges both that he was injured by the officers' handcuffing, and that he was subjected to unreasonable pain as a result of the officers ignoring his requests to loosen the handcuffs. (Doc. 52 at 15–16.) Contested issues of fact preclude finding that Edwards and Nolan are entitled to qualified immunity as to Todd's claim of excessive force through overly tight handcuffing. The bodycam footage shows Todd complaining multiple times that his handcuffs are too tight, but also shows the officers checking the handcuffs multiple times in response to Todd's complaints. At oral argument, Todd contended that although the officers "paid lip service" to Todd's requests to loosen the handcuffs and check their fit, Edwards and Nolan did not actually ensure that the handcuffs were properly fitted.

For their part, Edwards and Nolan argue that the videos clearly show that the handcuffs were so loose that there was a gap between Todd's wrists and the handcuffs, such that Edwards was able to fit a finger between the handcuffs and Todd's wrists. Todd disputes this, declaring in an affidavit that, "[w]hile the video

31

depicts daylight between part of my wrists and the handcuffs, what cannot be seen is that the handcuffs were excessively tight on the bony portion of my wrists where my forearms meet my hands.  Due to the shape of my wrists, the handcuffs were tight in some areas while loose in others, and they were so tight that I could not feel my hands."  (Doc. 53-2 at ¶ 7.)

Todd has also presented an opinion from a medical doctor asserting that he suffered unspecified injuries to his wrists.  (Doc. 53-4 at ¶ 4.)  Edwards and Nolan alleged at oral argument that any injuries Todd sustained to his wrists were a result of his own incessant twisting and struggling before the officers were able to double-lock the handcuffs to keep them from becoming tighter.  They also presented an alternate theory that any wrist injuries are preexisting and/or chronic.  The existence, extent, and causation of these alleged injuries are factual disputes that bear directly on whether Edwards and Nolan are entitled to qualified immunity.

The Court has extensively reviewed the bodycam footage from the night of December 4, 2021, and it is not evident from those videos alone whether Todd's handcuffs were too tight.  While the footage clearly shows that Edwards and Nolan did not ignore Todd's complaints about the handcuffs, it is not possible to tell whether they actually adjusted the fit of the handcuffs or whether, as Todd contends, they merely paid lip service to doing so.

Accordingly, summary judgment on the issue of whether Todd's handcuffing constituted excessive force is precluded by questions of material fact.

In summation, Edwards and Nolan are not entitled to qualified immunity as to Todd's claims that he was unlawfully seized to conduct a pat-down search, and that he was subjected to excessive force through overly tight handcuffing. But they are entitled to qualified immunity on Todd's claim that he was unlawfully seized when arrested, and that the leg-sweep constituted excessive force.

### c.    Krista Kolstad's Fourteenth Amendment Claim

As for Krista's § 1983 claim, the Kolstads include a sentence at the end of their Amended Complaint's General Allegations and also toward the end of each Count that states, with some minor variations: "Plaintiff, Krista Kolstad, suffered injuries including intentional infliction of emotional distress, loss of consortium, and other damages, as a result of the brutal attack and excessive use of force on her husband, Todd Kolstad, by Defendants." (Doc. 31 at ¶¶ 43, 48, 56, 65, 71.) Count I does not specifically state which of Krista's constitutional rights Defendants allegedly violated.

In response to Glasgow and Weber's initial motion for summary judgment—in which they argued that Krista cannot bring suit for violation of her husband's Fourth Amendment rights (Doc. 43 at 4–8)—Krista clarified that the constitutional violation she alleges on her own behalf is a Fourteenth Amendment deprivation of

the liberty interest in her familial relationship with Todd.  (Doc. 57 at 4–5.)[4]

For Krista to bring a successful § 1983 claim based on a Fourteenth Amendment familial association right, she must demonstrate that the officers' conduct deprived her of a familial interest "in a manner that 'shocks the conscience.'"  *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022) (quoting *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013)).  In situations where officers have "to make 'a snap judgment because of an escalating situation,' then their conduct does not shock the conscience unless they 'act[ed] with a *purpose to harm* unrelated to legitimate law enforcement objectives.'"  *Id.* (emphasis in original) (quoting *Hayes*, 736 F.3d at 1230).  Krista has not presented any evidence or offered any argument that suggests the officers acted with such a purpose.

In any event, the Court need not conduct an extended inquiry into whether Edwards and Nolan acted with a purpose to harm Todd because no Fourteenth

---

[4] It is somewhat questionable whether Krista's Fourteenth Amendment claim was properly raised in the Amended Complaint, and "[i]t is well-settled in the Ninth Circuit that parties generally cannot assert unpled theories for the first time at the summary judgment stage."  *Bullard v. Wastequip Mfg. Co.*, 2015 WL 12766467, at *10 (C.D. Cal. Apr. 14, 2015).  "[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings."  *Wasco Prods., Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)).  The Court will nevertheless consider the merits of Krista's due process claim since the pleadings contain assertions that the Fourteenth Amendment rights of both Kolstads were violated, as well as references to Krista's loss of consortium with Todd.  (Doc. 31 at ¶¶ 1, 43, 48.)

Amendment spousal association right was clearly established in December 2021.

Krista cites a number of cases that purportedly establish the Fourteenth

Amendment right she asserts was violated.  (Doc. 57 at 4–6.)  But all of these cases

involve a parent-child relationship, not a spousal relationship.  Moreover, in each

of these cases either the parent or child died, meaning the severance of the familial

association was permanent and irreversible.  The facts at issue here are not

remotely similar to those in the cases Krista cites.

Most importantly, the cases Krista cites for the proposition that her

Fourteenth Amendment right was clearly established are all from the 1980s and

1990s.  In 2022, however, the Ninth Circuit was confronted with a Fourteenth

Amendment familial association claim based on a spousal relationship, and the

court stated that it had "not previously held whether a substantive due process right

exists in that context, and other courts of appeals have reached conflicting

conclusions."  *Peck*, 51 F.4th at 893.  Thus, even assuming for the sake of

argument that Krista had a Fourteenth Amendment spousal association right which

was violated by Edwards and Nolan because they acted with a purpose to harm

Todd, this right was not clearly established on the night of December 4, 2021.

Accordingly, Edwards and Nolan are entitled to qualified immunity as to

Krista's § 1983 claim in Count I.

/ / /

### 2.     Counts III, IV, and V – State Law Claims

Edwards and Nolan argue that they are entitled to immunity under Mont. Code Ann. § 2-9-305(5) for all state law claims brought by Plaintiffs.  (Doc. 39 at 20–22.)  The statute provides:

> In an action against a governmental entity, the employee whose conduct gave rise to the suit is immune from liability by reasons of the same subject matter if the governmental entity acknowledges or is bound by a judicial determination that the conduct upon which the claim is brought arises out of the course and scope of the employee's employment. . . .

Mont. Code Ann. § 2-9-305(5).

For immunity to attach under § 2-9-305(5), the plaintiff must (1) name a governmental entity as a defendant, and (2) the governmental entity must acknowledge or be bound by a judicial determination that the employee's conduct upon which the claim was brought arose out of the course and scope of his employment.  *Id*.

Here, the City of Glasgow, a government entity, is a named defendant.  All of the Kolstads' allegations against Edwards and Nolan are based on actions they performed while in the course and scope of their employment as law enforcement officers, and Glasgow has acknowledged that Edwards and Nolan were acting in the course and scope of their employment when they arrested Todd.  Moreover, the Kolstads concede that Edwards and Nolan are immune under § 2-9-305(5).  (Doc. 52 at 16–17.)

36

Consequently, Edwards and Nolan are immune from individual liability for the Kolstads' state law claims, and therefore Edwards and Nolan's Motion for Summary Judgment (Doc. 42) will be granted as to Counts III, IV, and V.

### B.     Claims Against Glasgow and Weber

Plaintiffs alleged claims against Weber for violation of their civil rights (Counts I and II) and negligence (Count III).  Weber moved for summary judgment on all claims against him.  (Doc. 71.)  In response, Plaintiffs conceded that Counts I, II, and III against Weber should be dismissed (Doc. 77 at 4–5), and reiterated this position at oral argument.

Plaintiffs also initially brought Counts I and II against Glasgow but later conceded in briefings and at oral argument that these claims should be dismissed. (*Id.* at 3–4.)  Accordingly, Glasgow and Weber's Motions for Summary Judgment (Docs. 42 and 71) will be granted as to all claims against Weber, and as to Counts I and II against Glasgow.

As noted above, the Kolstads are proceeding against Glasgow on Counts III, IV, and V under Mont. Code Ann. § 2-9-305(5) on a theory of vicarious liability.

### 1.     Counts III and IV Against Glasgow

Although Glasgow initially moved for summary judgment as to the negligence claim in Count III (Doc. 72 at 11–13), counsel for Glasgow conceded at oral argument that summary judgment on the city's liability for the negligence

claims is not appropriate at this time.  Counsel for Glasgow also stated that summary judgment is not appropriate on the assault and battery claims. Accordingly, summary judgment will be denied as to Glasgow on Counts III and IV.

### 2.    Count V – Intentional Infliction of Emotional Distress

The Kolstads assert claims for intentional infliction of emotional distress ("IIED"), and allege they "have both suffered serious and severe emotional distress as a result of the physical attack on Plaintiff, Todd Kolstad, that was administered by the Defendants."  (Doc. 31 at ¶ 73.)[5]  Under Montana law, "an independent cause of action for intentional infliction of emotional distress will arise under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's intentional act or omission."  *Sacco v. High Country Indep. Press, Inc.*, 896 P.2d 411, 428 (Mont. 1995).  Montana has adopted a heightened threshold standard for standalone emotional distress claims, as set out in the Restatement (Second) of Torts § 46, comment j.  *Id.* at 426.  To meet this threshold, the emotional distress inflicted

---

[5] The Court notes that although both Plaintiffs and Glasgow refer to Krista's claim for negligent infliction of emotional distress ("NIED") (Doc. 43 at 8; Doc. 57 at 9), Count V of the Amended Complaint only specifies a claim of IIED. Nevertheless, the essential elements for both claims are the same, the difference being that a plaintiff can request relief in the form of punitive damages when the cause of action involves intentional infliction of emotional distress.  *Sacco v. High Country Indep. Press, Inc.*, 896 P.2d 411, 429 (Mont. 1995).

must be "'so severe that no reasonable person could be expected to endure it.'" *Id.* at 423 (quoting *Lence v. Hagadone Inv. Co.*, 853 P.2d 1230, 1237 (Mont. 1993)).

"[I]t is for the court to determine whether on the evidence severe or serious emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Id.* at 429. "The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress." Restatement (Second) of Torts § 46, comment j at 78. The Montana Supreme Court has pointed to several factors for determining whether there is sufficient evidence of severe emotional distress, including: (1) whether the plaintiff had any physical manifestations of emotional distress; (2) whether counseling was sought or recommended; (3) whether the plaintiff took medication or the use of medication dramatically increased; (4) whether the plaintiff had continuous nights of sleeplessness or days without appetite; (5) whether the plaintiff maintained close relationships with family members and friends; (6) the duration of the emotional distress; and (7) the circumstances under which the infliction incurred, including whether the plaintiff witnessed a distressing event. *Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338, 345 (Mont. 2013).

"In cases where there is a physical manifestation of bodily harm resulting from emotional distress, such as PTSD, this bodily harm is sufficient evidence that

39

the emotional distress suffered by the plaintiff is genuine and severe." *Henricksen v. Montana*, 84 P.3d 38, 55 (Mont. 2004). But just because a person's emotional distress is genuine and severe, it does not necessarily mean their distress is so severe no reasonable person could be expected to endure it. *See Maloney v. Home & Inv. Ctr., Inc.*, 994 P.2d 1124, 1135–36 (Mont. 2000) (collecting Montana Supreme Court cases in which emotional distress claims alleging similar physical symptoms were both upheld and dismissed).

"[S]ummary judgment is appropriate for disposing of an emotional distress claim that lacks sufficient evidentiary support." *White v. Mont. ex rel. Mont. State Fund*, 305 P.3d 795, 805 (Mont. 2013). A party bringing a claim for IIED "cannot defeat summary judgment simply by reciting conclusory, unsupported, or speculative statements," but must instead produce substantial evidence. *Feller*, 299 P.3d at 346.

In *Feller*, the plaintiff provided deposition testimony and an answer to an interrogatory to the effect that she experienced symptoms including "anxiety attacks, severe headaches, shoulder pain, bathroom difficulties, sleeplessness, [and] overeating from stress." *Id.* Nevertheless, the court upheld dismissal of her IIED claim at summary judgment because she offered no evidence to buttress these alleged symptoms. The court found there was insufficient evidence to show she suffered emotional distress so severe that no reasonable person could be expected

40

to endure it.  *Accord Howell*, 2014 WL 2594235, at *18 ("The Court concludes that [plaintiffs'] general statements about sleep and pain medication, nervousness, unfriendliness, and uncomfortableness fail to raise a genuine issue of material fact as to whether [plaintiffs] suffered emotional distress that was so severe that no reasonable person could be expected to endure it as required under *Sacco*.").

### a.    Krista Kolstad's IIED Claim

The Amended Complaint asserts that Krista suffered emotional distress but contains no factual allegations to that effect.  Glasgow, in its brief in support of summary judgment, points out that Krista has not been treated for any mental health issues, nor did she describe any such issues in response to an interrogatory requesting she "identify and describe in detail all injuries, ailments, or pains—including both physical and emotional problems—which you claim to have suffered and/or are presently suffering as a result of your interaction with Glasgow Police Officers on December 4, 2021."  (Doc. 44-2 at 4–6.)

In response, Plaintiffs appended to their response brief a supplemental answer to this interrogatory in which Krista asserts, for the first time, that her emotional distress "has physically manifested in numerous ways, including chronic insomnia, hair loss, and weight gain."  (Doc. 59-1 at 4.)  Krista also supplemented her response to Glasgow's interrogatory that asked her to identify her mental healthcare providers and medications by stating that she has neither the time nor

41

the money to seek treatment for counseling or therapy. (*Id*.) Plaintiffs' initial responses to these interrogatories were submitted in December 2024 and not supplemented until July 2025, approximately one month after Glasgow filed its motion for summary judgment. In its reply brief, Glasgow argues that Krista's belated disclosures of physical manifestations of emotional distress are both insufficient to demonstrate severe emotional distress under Montana substantive law and procedurally improper attempts to prevent summary judgment. (Doc. 61 at 7–9.)

The Court need not address Glasgow's arguments as to whether Krista's belated supplemental answers to interrogatories should be considered; even accounting for Krista's statements that she experienced physical symptoms of emotional distress, she does not present any evidence that her symptoms rise to the level of emotional distress that is so serious or severe no reasonable person could be expected to endure it. Krista alleges that her emotional distress resulted not from witnessing the events of December 4, 2021, but, essentially, from becoming "Todd's fulltime caregiver" due to Todd's issues with forgetfulness, attention span, and anger allegedly resultant from a brain injury he suffered when Edwards and Nolan brought him to the ground. (Doc. 59-1 at 2–4.) Other than her own statements, Krista, like the plaintiff in *Feller*, does not produce any of the substantial evidence necessary to sustain an independent emotional distress claim.

42

Glasgow is therefore entitled to summary judgment as to Krista's claim in Count V.

### b.   Todd Kolstad's IIED Claim

Although Glasgow and Weber's Motion for Summary Judgment requests summary judgment "on all claims against them," (Doc. 71 at 1), Glasgow never specifically addressed Todd's Count V IIED claim and no party submitted briefing as to the merits of Todd's IIED claim.  Accordingly, the Court will not enter summary judgment in favor of Glasgow on Todd's Count V claim.

Nevertheless, regardless of whether Todd maintains a stand-alone IIED claim, he can seek emotional distress damages associated with his § 1983 and state law claims.  *See Jacobsen v. Allstate Ins. Co.*, 215 P.3d 649, 664 (Mont. 2009).  The heightened standard of proof established in *Sacco* "applies only to independent causes of action for infliction of emotional distress, and not to emotional distress claimed as an element of damage arising from a different cause of action (sometimes called 'parasitic claims' for emotional distress)."  *White v. Longley,* 244 P.3d 753, 762–63 (Mont. 2010) (explaining that for parasitic emotional distress damages, "the severity of the distress affects the amount of damages recovered but not the underlying entitlement to recover").

/ / /

/ / /

## IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.    Defendants Edwards and Nolan's Motion for Summary Judgment (Doc. 38) is **DENIED** as to Todd Kolstad's § 1983 claims of unlawful seizure related to the pat-down search and Todd's claim of excessive use of force through overly tight handcuffing in Count I, and **GRANTED** as to all remaining claims.

2.    Defendants Glasgow and Weber's Motions for Summary Judgment (Docs. 42 and 71) are **GRANTED** as to all claims against Weber, as to Counts I and II against Glasgow, and as to Krista Kolstad's claim for intentional infliction of emotional distress in Count V, and **DENIED** as to all other claims.

**IT IS ORDERED**.

DATED this 31st day of March, 2026.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge